# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STOP THIS INSANITY, INC. EMPLOYEE LEADERSHIP FUND, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>FEDERAL ELECTION COMMISSION,<br><br>Defendant. | Civil Action No. 12-1140 (BAH)<br><br>Judge Beryl A. Howell |

## MEMORANDUM OPINION

Plaintiffs Stop This Insanity, Inc. Employee Leadership Fund ("the Leadership Fund"), Stop This Insanity, Inc. ("STI"),[1] Glengary LLC, Todd Cefaratti, and Ladd Ehlinger bring this as-applied First Amendment challenge against three provisions of the Federal Election Campaign Act ("FECA"), namely 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3) (which limit the dollar amount of contributions to political committees); and 441b(b)(4)(A)(i) (which restricts the pool of citizens from which connected political committees established by a corporation may solicit contributions).[2] The Leadership Fund is a "connected" political action committee ("PAC")[3] or

---

[1] The plaintiffs refer to STI as both "Stop the Insanity, Inc." and "Stop This Insanity, Inc." in their Complaint. *Compare* Compl. ¶ 17, *with id.* ¶ 18. It appears that the correct name is Stop This Insanity, Inc. *See* Ariz. Corp. Comm'n, Corps. Div., http://starpas.azcc.gov/scripts/cgiip.exe/WService=wsbroker1/corp-detail.p?name-id=15854462 (last visited Nov. 5, 2012).

[2] The plaintiffs also reference that they challenge the application of the source restrictions in 2 U.S.C. § 441b(a), which prohibits, *inter alia*, political committees from accepting contributions from corporations. *See* Compl. ¶ 1, ECF No. 1; Pls.' Mem. in Supp. Mot. Prelim. Inj. ("Pls.' Mem.") at 1, ECF No. 4-1. The plaintiffs do not clearly articulate the nature of their challenge to § 441b(a). In fact, the plaintiffs do not cite that provision anywhere in their three causes of action, and they do not say that they seek declaratory or injunctive relief from that provision in their prayer for relief. *See* Compl. at 15–21. Because the plaintiffs only mention this provision in passing, the Court does not construe the plaintiffs' Complaint to state a claim for relief against that provision, and the Court will not further address § 441b(a) in this opinion.

[3] The term political action committee or "PAC" is generally used as a synonym for "separate segregated fund." It "normally refers to organizations that corporations or trade unions might establish for the purpose of making contributions or expenditures that the [FECA] would otherwise prohibit." *FEC v. Akins*, 524 U.S. 11, 15 (1998); *see also* BLACK'S LAW DICTIONARY 1276 (9th ed. 2009) (defining PAC as "[a]n organization formed by a special-

"separate segregated fund" of the corporation STI.  Compl. ¶ 17, ECF No. 1.  The Leadership

Fund seeks declaratory and injunctive relief that would allow it to solicit and accept unlimited

contributions to finance unlimited independent political expenditures through an independent

expenditure-only account not subject to the restrictions set forth in §§ 441a(a)(1)(C), 441a(a)(3),

and 441b(b)(4)(A)(i).  *Id.* ¶ 1.  In their three-count Complaint, the plaintiffs seek a declaratory

judgment that the prohibitions contained in these portions of the FECA are unconstitutional as

applied to their proposed solicitation and contribution activities.  *Id.* at 20–22.  The plaintiffs also

seek preliminary and permanent injunctive relief that would prohibit the defendant Federal

Election Commission ("FEC") from enforcing §§ 441a(a)(1)(C), 441a(a)(3), and

441b(b)(4)(A)(i) against the Leadership Fund and any individual or corporate contributors to an

independent expenditure-only account established by the Leadership Fund.  *See id.*

## I.   BACKGROUND

STI is a not-for-profit social welfare organization, incorporated in Arizona, which is

currently seeking tax-exempt status under § 501(c)(4) of the Internal Revenue Code.  *See* Compl.

¶ 18.[4]  The Leadership Fund is a separate segregated fund ("SSF") that was established by and

connected to STI and registered with the FEC as a political committee on January 4, 2012.

Compl. Ex. B at 3, ECF No. 1-1.  Under the FECA, a corporation may establish an SSF to

engage in political activities, *see* 2 U.S.C. § 441b(b)(2)(C), and "[s]uch a PAC . . . may be

wholly controlled by the sponsoring corporation," *FEC v. Beaumont*, 539 U.S. 146, 149 (2003).

---

interest group to raise and contribute money to the campaigns of political candidates who the group believes will
promote its interests).

[4] An organization that is "not organized for profit but operated exclusively for the promotion of social welfare . . .
and the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes," is exempt
from taxation under § 501(c)(4). According to its Articles of Incorporation, STI is a "*political* non-partisan non-
profit organization" that "will not represent any candidate or party" and "gather[s] donations and donate[s] to any
candidate or party that represents original US Constitutional principles."  *See* Articles of Incorporation,
http://images.azcc.gov/scripts/cgi/dwispart2.pl (filed Feb. 25, 2010) (emphasis added).

All SSFs, however, must register as "political committees" under the FECA.  *See* 2 U.S.C.

§§ 431(4)(B), 433.[5]  Likewise, all political committees, including SSFs, are required to abide by

certain organizational, record-keeping, and reporting requirements, *see* 2 U.S.C. §§ 432, 433,

434, as well as contribution limits, *see id.* § 441a.  Under the contribution limits, no person is

allowed to make "contributions" to any "other political committee" (which includes SSFs) "in

any calendar year which, in the aggregate, exceed $5,000."  *Id.* § 441a(a)(1)(C).  Additionally,

SSFs are uniquely required to observe certain limits upon the universe of people from whom

they solicit contributions.  Specifically, subject to certain limited exceptions, it is unlawful "for a

corporation, or a separate segregated fund established by a corporation, to solicit contributions to

such a fund from any person other than its stockholders and their families and its executive or

administrative personnel and their families."  *Id.* § 441b(b)(4)(A)(i).[6]  The Leadership Fund

asserts that these restrictions on the solicitations and contributions of connected PACs are

unconstitutional as applied to it, in light of recent developments in the law of campaign finance

and the First Amendment.

Currently, the Leadership Fund maintains a single bank account into which it receives

"hard money"[7] contributions that are subject to the contribution limits, solicitation restrictions,

and reporting and disclosure requirements of the FECA.  Compl. Ex. A at 2, ECF No. 1-1.[8]  The

---

[5] Other types of associations may also establish SSFs, including labor organizations, membership organizations, or cooperatives.  *See* 2 U.S.C. § 441b(b)(2)(C).  This case, however, only involves an SSF established by a corporation.

[6] The FECA defines "executive or administrative personnel" to mean "individuals employed by a corporation who are paid on a salary, rather than hourly, basis and who have policymaking, managerial, professional, or supervisory responsibilities."  2 U.S.C. § 441b(b)(7).

[7] The term "hard money" refers to "contributions subject to [FECA's] source, amount, and disclosure requirements." *See Shays v. FEC*, 528 F.3d 914, 917 (D.C. Cir. 2008) (alteration in original) (internal quotation marks omitted). Conversely, "soft money" refers to "[p]olitical donations made in such a way as to avoid federal regulations or limits."  *Id.* (alteration in original) (internal quotation marks omitted).

[8] The FECA defines "contributions" as "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office" or "the payment by any

Leadership Fund wants to use the funds from this bank account to make direct contributions to candidates for federal political office.  Compl. ¶ 23.  The Leadership Fund, however, would also like to expand its political activities to include "independent expenditures," *id.*, which are expenditures "expressly advocating the election or defeat of a clearly identified candidate" but that are "not made in concert or cooperation with or at the request or suggestion of such candidate, the candidate's authorized political committee, or their agents, or a political party committee or its agents," 2 U.S.C. § 431(17).  Since independent expenditures currently enjoy fewer restrictions than direct contributions to candidates, the Leadership Fund would like to establish a second, separate bank account, for which it would like to solicit unlimited contributions from the general public in order to finance its "independent expenditures."  Compl. Ex. A at 2; *see also Carey v. FEC*, 791 F. Supp. 2d 121, 130–32 (D.D.C. 2011) (approving "separate accounts for hard-money and soft-money contributions and expenditures").  This separate account would not be used to contribute directly to candidates, political parties, or other political committees, and is therefore sometimes referred to as a "non-contribution" account or, more accurately, an "independent expenditure-only account."

To that end, the Leadership Fund submitted an advisory opinion request to the FEC on January 4, 2012, asking the FEC "whether it may open a[n] [independent expenditure-only] account . . . to accept contributions from individuals, corporations, and unions that is not subject to the limitations and prohibitions of 2 U.S.C. § 441a(a)(1)(C) or § 441b . . . to conduct Independent Expenditures and proportionally pay[] an appropriately tailored share of administrative expenses."  Compl. Ex. A at 1; *see also* 2 U.S.C. § 437f(a) (requiring the FEC to render a written advisory opinion in response to a "complete written request concerning the

---

person of compensation for the personal services of another person which are rendered to a political committee without charge for any purpose."  2 U.S.C. § 431(8)(A).

application of [the FECA] or a rule or regulation prescribed by the [FEC], with respect to a specific transaction or activity by the person").

On February 17, 2012, the FEC issued two draft advisory opinions in response to the Leadership Fund's request. The first draft advisory opinion ("Draft A") concluded that the Leadership Fund "may establish a[n] [independent expenditure-only] account and solicit and accept unlimited contributions from individuals, other political committees, corporations, and labor organizations, STI itself, and STI's restricted class" for the purpose of financing independent expenditures. Compl. Ex. B at 2. The second draft advisory opinion ("Draft B"), however, reached the opposite conclusion: "the [FECA] and [FEC] regulations prohibit [the Leadership Fund] and STI from establishing a[n] [independent expenditure-only] account for [the Leadership Fund] that would receive unlimited contributions solicited from all STI employees and the general public for the purpose of financing independent expenditures." *Id.* Ex. C at 4, ECF No. 1-1. Both of these advisory opinions recognized that none of the recent judicial decisions issued in the realm of campaign finance and the First Amendment directly address whether FECA's contribution limits and solicitation restrictions are constitutional as applied to an SSF, *i.e.*, a political committee connected to a corporation or labor organization. *Id.* Ex. B at 7; *id.* Ex. C at 6–7.

On March 2, 2012, the FEC certified that it had failed on a vote of 3-3 to approve either draft advisory opinion. *See* Compl. Ex. D at 1, ECF No. 1-1.[9] Without the FEC's blessing, the Leadership Fund was (and continues to be) unable to solicit contributions for independent expenditures without being subject to the contribution limits in § 441a(a) or the solicitation restrictions in § 441b(b)(4)(A) because the Leadership Fund alleges that it "will face a credible

---

[9] The FEC is required to approve any advisory opinion by the affirmative votes of four members. *See* 11 C.F.R. § 112.4(a) (2012).

threat of prosecution if it solicits or accepts contributions to a[n] [independent expenditure-only] account in excess of the limits contained in 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3)" or "in derogation of the restriction at 2 U.S.C. § 441b(b)(4)(A)(i)."  Compl. ¶¶ 51, 52.  Feeling "required to mute itself and curtail its activities" during the 2012 election cycle, *id.* ¶ 37, the Leadership Fund—along with its connected corporate entity (STI) and three potential donors who wish to make contributions to the Leadership Fund but are currently prohibited by the FECA from doing so (Glengary LLC, Todd Cefaratti, and Ladd Ehlinger)—filed the Complaint in the instant action on July 10, 2012.  Pending before the Court are the plaintiffs' Motion for Preliminary Injunction and the FEC's Motion to Dismiss.[10]  For the reasons discussed below, the Court will deny the plaintiff's Motion for Preliminary Injunction and will grant the FEC's Motion to Dismiss.

## II.   LEGAL STANDARDS

### A.   <u>Preliminary Injunction</u>

The purpose of a preliminary injunction "is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  It is "an extraordinary and drastic remedy" and "should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis and internal quotation mark omitted).  Plaintiffs seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits of their claims; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tip in their favor; and (4) and injunction is in the public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011).

---

[10] The FEC's Motion to Dismiss became fully briefed on October 18, 2012.

Historically, these four factors have been evaluated on a "sliding scale" in this Circuit, such that "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009).  Recently, however, the continued viability of that approach has been called into some doubt, as the D.C. Circuit has suggested, without holding, that a likelihood of success on the merits is an independent, free-standing requirement for a preliminary injunction.  *See Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011) ("[W]e read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'" (citation omitted) (quoting *Davis*, 571 F.3d at 1296 (Kavanaugh, J., concurring))).  Absent binding authority or clear guidance from the Court of Appeals, however, the Court finds that the most prudent course is to bypass this unresolved issue and proceed to explain why a preliminary injunction is not appropriate under the "sliding scale" framework.  If the plaintiffs cannot meet the less demanding "sliding scale" standard, then they cannot satisfy the more stringent standard alluded to by the Supreme Court and the Court of Appeals.

That being said, in meeting the requisite burden for injunctive relief, "[i]t is particularly important for the movant to demonstrate a likelihood of success on the merits." *Konarski v. Donovan*, 763 F. Supp. 2d 128, 132 (D.D.C. 2011).  Indeed, "absent a 'substantial indication of probable success [on the merits], there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review.'" *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F. Supp. 2d 114, 140 (D.D.C. 1999) (alteration in original) (quoting *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977)).  Assessing the likelihood of success on the merits "does not involve a final determination of the

merits, but rather the exercise of sound judicial discretion on the need for interim relief." *Nat'l Org. for Women v. Soc. Sec. Admin.*, 736 F.2d 727, 733 (D.C. Cir. 1984) (internal quotation marks omitted).  "As an extraordinary remedy, courts should grant such relief sparingly." *Konarski*, 763 F. Supp. 2d at 133 (citing *Mazurek*, 520 U.S. at 972); *see also Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) ("The power to issue a preliminary injunction, especially a mandatory one, should be sparingly exercised." (internal quotation marks omitted)).

### B. <u>Motion to Dismiss</u>

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face" and to "nudge[] [his or her] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* FED. R. CIV. P. 12(b)(6).  "[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration in original) (quoting *Twombly*, 550 U.S. at 557).  Instead, the complaint must plead facts that are more than "'merely consistent with' a defendant's liability"; "the plaintiff [must] plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556); *accord Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012).  The Court "must assume all the allegations in the complaint are true (even if doubtful in fact) . . . [and] must give the plaintiff the benefit of all reasonable inferences derived from the facts alleged." *Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 17 (D.C. Cir. 2008) (citations and internal quotation marks omitted).

### III.   DISCUSSION

This is the most recent attempt by a non-profit entity to invalidate, on First Amendment grounds, federal regulations related to independent political expenditures.  Such challenges within this Circuit and before the Supreme Court have enjoyed almost universal success in recent years on the premise that "independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption."  *Citizens United v. FEC*, 130 S. Ct. 876, 909 (2010); *see also SpeechNow.org v. FEC*, 599 F.3d 686, 696 (D.C. Cir. 2010) ("[T]he government can have no anti-corruption interest in limiting contributions to independent expenditure-only organizations."); *EMILY's List v. FEC*, 581 F.3d 1, 12 (D.C. Cir. 2009) ("[L]imiting donations to and spending by non-profits in order to prevent corruption of candidates and officeholders represents a kind of 'prophylaxis-upon-prophylaxis' regulation to which the Supreme Court has emphatically stated, 'Enough is enough.'" (quoting *FEC v. Wis. Right to Life, Inc.* ("*WRTL*"), 551 U.S. 449, 478–79 (2007))).  It is of course not the Court's prerogative to question the authority of these decisions, but as the following discussion makes clear, the implications of *Citizens United* and its progeny do not compel the relief the plaintiffs seek.  The Court will first assess the plaintiffs' probability of success on the merits before evaluating the plaintiffs' showing on the other three preliminary injunction factors.

### A.   <u>Probability of Success on the Merits</u>

In assessing the viability of the plaintiffs' as-applied constitutional challenge, it is critical to observe that this is a case about regulating the solicitation and fundraising activities of "connected" SSFs—PACs that are established, administered, and subsidized by corporations. SSFs have unique characteristics that come to bear on the Court's analysis below.

First, although all political committees must disclose the amount of all "contributions" they receive and the source of any such contributions over $200, *see* 2 U.S.C. §§ 434(b)(2)(A), 434(b)(3)(A), the FECA specifically exempts from the definition of "contributions" any funds used for "the establishment, administration, and solicitation of contributions to a [SSF] to be utilized for political purposes by a corporation," *id.* § 441b(b)(2)(C).  Therefore, any funds provided by a corporation to finance the administration and solicitation of contributions to its SSF need not be disclosed to the government and need not count against the contribution limits established for political committees.  *See* 2 U.S.C. § 441a(a)(1)(C) (limiting contributions to "other political committees," which includes SSFs); *id.* § 434 (requiring disclosure of all contributions and the source of any contributions over $200)

Second, although an SSF's solicitation activities are permitted to benefit from undisclosed corporate subsidization, the FECA limits the universe of people the SSF may solicit: An SSF may generally solicit contributions only from its connected corporation's "stockholders and their families and its executive or administrative personnel and their families."  *Id.* § 441b(b)(4)(A)(i).  The SSF (or its connected corporation) may also solicit rank-and-file employees of the connected corporation to contribute to the SSF as long as the solicitations are: (1) made in writing; (2) addressed to the employees at their residence; (3) made only twice per calendar year; and (4) designed such that the SSF and its connected corporation "cannot determine who makes a contribution of $50 or less as a result of such solicitation and who does not make such a contribution."[11]  *Id.* § 441b(b)(4)(B).  Thus, there is a major statutory trade-off for SSFs:  an SSF can have all of its administrative and solicitations costs paid for by its

---

[11] This statutory mechanism, although admirably intended to prevent rank-and-file corporate employees from feeling coerced into making political contributions, appears to be easy to circumvent.  For example, any corporation intent on discovering which employees failed to contribute to its connected PAC could refuse to accept any employee contributions of $50 or less and, with this contribution minimum, could thereby deduce which employees gave and which employees did not.

connected corporation and need not report the amount or source of those funds, but in order to enjoy those financial, non-disclosure, and non-reporting benefits the SSF must limit its solicitation base.  If, however, a political committee wishes to solicit contributions from the general public, it must disconnect from its affiliated corporation, pay its own administrative and solicitation expenses, and disclose and report the amount and source of all funds raised— including any funds that go toward administration and solicitation expenses.  In essence, as the FEC points out, the plaintiffs are seeking relief that would create such a large loophole in political committee disclosure requirements that those requirements would be meaningless.  *See* Def.'s Opp'n to Pls.' Mot. Prelim. Inj. ("Def.'s Opp'n") at 15, ECF No. 6 ("This lawsuit, however, seeks to have the statutory disclosure exception swallow the rule . . . .").

Third, since *Citizens United*, SSFs have become vestiges of a bygone world of campaign finance.  Section 441b's original purpose was "to prohibit contributions or expenditures by corporations or labor organizations in connection with federal elections," and the SSF was created to "permit[] some participation of unions and corporations in the federal electoral process."  *FEC v. Nat'l Right to Work Comm.* ("*NRWC*"), 459 U.S. 197, 201 (1982).  This legislative compromise prevented corporations from directly engaging in political spending, while permitting corporations' beneficial owners and employees to pool their personal resources to engage in organized political speech.  SSFs continue to be a mechanism through which the beneficial owners and employees of corporations can band together to make direct contributions to candidates and political parties, which corporations are still prohibited from doing directly under the FECA and First Amendment jurisprudence.  *See, e.g.*, *Beaumont*, 539 U.S. at 161–63 (upholding § 441b(a)'s prohibition on direct political contributions by corporations); *see also* *Green Party of Conn. v. Garfield*, 616 F.3d 189, 199 (2d Cir. 2010) ("*Beaumont* and other cases

applying the closely drawn standard to contribution limits remain good law.  Indeed, in the

recent *Citizens United* case, the [Supreme] Court . . . explicitly declined to reconsider its

precedents involving campaign *contributions* by corporations to candidates for elected office.").

Yet, corporations no longer need SSFs to engage in unlimited independent expenditures with

general treasury funds.  The Supreme Court eliminated this dependency in *Citizens United* by

allowing corporations themselves (rather than just their constituent members, officers,

employees, etc.) to engage in unlimited independent political expenditures.  *See Citizens United*,

130 S. Ct. at 913.  Thus, it bears mentioning that the relief sought by the plaintiffs in the instant

action is completely unnecessary to allow the plaintiffs to engage in unlimited independent

expenditures, individually or together.  Rather, this case narrowly touches upon the particular

accounting mechanism through which the plaintiffs may make those expenditures.

Finally, the Supreme Court has recognized that SSFs are inherently suspect in certain

respects by virtue of the fact that a single entity (corporation, labor union, etc.) pays all of their

administration expenses.  In *California Medical Association v. FEC* ("*Cal-Med*"), 453 U.S. 182

(1981), the Supreme Court observed:

> If unlimited contributions for administrative support are permissible, individuals
> and groups like CMA could completely dominate the operations and contribution
> policies of independent political committees such as CALPAC.  Moreover, if an
> individual or association was permitted to fund the entire operation of a political
> committee, all moneys solicited by that committee could be converted into
> contributions, the use of which might well be dictated by the committee's main
> supporter.  In this manner, political committees would be able to influence the
> electoral process to an extent disproportionate to their public support and far
> greater than the individual or group that finances the committee's operations
> would be able to do acting alone.  In so doing, they could corrupt the political
> process in a manner that Congress, through its contribution restrictions, has
> sought to prohibit.

*Cal-Med*, 453 U.S. at 198 n.19.  Connected SSFs can essentially accept "unlimited contributions

for administrative support" because of the exemption in 2 U.S.C. § 441b(b)(2)(C) and therefore

officials with control of the money spigot at the connected corporation can "completely dominate the operations and contribution policies" of the SSF. *See id.* Moreover, SSFs may also accept unlimited amounts of undisclosed money from the connected corporation to pay for solicitations. *See* 2 U.S.C. § 441b(b)(2)(C). Because of this, SSFs are "able to influence the electoral process to an extent disproportionate to their public support," and can do so to an extent "far greater than the [connected corporation] would be able to do acting alone." *Cal-Med*, 453 U.S. at 198 n.19; *see also EMILY's List*, 581 F.3d at 12 n.10 ("The requirement that certain administrative expenses be funded in part with hard money prevents a contributor from essentially taking control of a non-profit and thereby circumventing limits on individual contributions to candidates." (citing *Cal-Med*, 453 U.S. at 198–99 n.19)).

With these facts in mind, the Court will first discuss recently established First Amendment principles regarding independent expenditures and the continuing vitality of campaign finance regulations. Then, with those principles in tow, the Court will proceed to evaluate the probability that the plaintiffs will succeed on the merits of their claims that the contribution and solicitation limitations in §§ 441a(a)(1)(C), 441a(a)(3), and 441b(b)(4)(A)(i) are unconstitutional as applied to SSFs that engage in both direct candidate contributions and express advocacy.

### 1. *First Amendment Principles*

The First Amendment, which provides that "Congress shall make no law . . . abridging the freedom of speech," U.S. CONST. amend. I, is an enduring bulwark against improper intrusions upon "the exercise of rights so vital to the maintenance of democratic institutions," *Schneider v. New Jersey*, 308 U.S. 147, 161 (1939). The First Amendment "is broadly staked on the view that our country and our people" should enjoy broad freedom to engage in "a robust and

uninhibited debate that is subject only to minimum controls necessary for the vitality of our democratic system." *See Nat'l Broad. Co. v. FCC*, 516 F.2d 1101, 1132 (D.C. Cir. 1975). Relevant to the context of the instant case, "[t]he First Amendment 'has its fullest and most urgent application to speech uttered during a campaign for political office.' *Citizens United*, 130 S. Ct. at 898 (quoting *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989)). Although allowing such a robust national conversation is certain to create passionate and, at times vitriolic, factions, "[f]actions should be checked by permitting them all to speak, and by entrusting the people to judge what is true and what is false." *Id.* at 907 (citation omitted) (citing The Federalist No. 10 (James Madison)).

The vitality of the First Amendment, however, is also predicated on the fact that the important rights subject to its protection are not absolute, and in certain contexts, must give way to other compelling governmental interests.[12] *See, e.g.*, *Times Film Corp. v. City of Chicago*, 365 U.S. 43, 47 (1961) ("It has never been held that liberty of speech is absolute."); *Marshall v. United States*, 176 F.2d 473, 474 (D.C. Cir. 1949) ("The rights guaranteed by the First Amendment are not absolute, and are subordinate to the greater rights of the general public interest, and to the right of the government to maintain and protect itself."); Frederick Schauer, *Harm(s) and the First Amendment*, 2011 SUP. CT. REV. 81, 81 ("The First Amendment has always had a delicate relationship with harm."). Therefore, ironically, some speech must be

---

[12] The Supreme Court has repeatedly recognized this principle in myriad contexts in recent years. *See, e.g.*, *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2727 (2010) (rejecting idea that "it is possible in practice to distinguish material support for a foreign terrorist group's violent activities and its nonviolent activities" in upholding statute that criminalized appellant's efforts to provide humanitarian and political support to organizations considered by the government to be "foreign terrorist organizations"); *Morse v. Frederick*, 551 U.S. 393, 403 (2007) ("The question thus becomes whether a principal may, consistent with the First Amendment, restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use. We hold that she may."); *Beard v. Banks*, 548 U.S. 521, 533–35 (2006) (upholding Pennsylvania prison regulation that prevented some prison inmates from having any access to newspapers, magazines, or photographs); *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.").

restricted in order to permit a healthy, functioning democracy to march onward.  *See, e.g.*, LARRY ALEXANDER, IS THERE A RIGHT OF FREEDOM OF EXPRESSION? 178 (2005) ("In liberal societies, free speech is important because it is believed to produce valuable consequences such as more truth, better democratic politics, and more individual self-development.  But this means that any freedom of speech principle carries with it a commitment to constrain speech that destroys these things.").  One oft-discussed kind of potentially harmful speech is money spent in the context of the electoral process.  When money is conceptualized as speech, as the Supreme Court has, [13] and when that pecuniary speech is given free reign to influence the election of those entrusted to lead and shape the character of our democracy, a legitimate and complex question arises about what constitutional limits can be placed on the flow of money spent with a political purpose—limits intended to prevent behavior that corrodes the very legitimacy and integrity of our democratic institutions.  In *Citizens United*, the Supreme Court reviewed—and rejected—the governmental interests used over the years to limit political speech, including "an antidistortion interest," and a "shareholder-protection interest," and concluded that while "[t]he appearance of influence or access . . . will not cause the electorate to lose faith in our democracy," activity that "lead[s] to, or create[s] the appearance of, *quid pro quo* corruption" is a sufficiently compelling governmental interest to justify limits on political speech.  *Citizens United*, 130 S. Ct. at 909–13.

---

[13] *See, e.g.*, *Citizens United*, 130 S. Ct. at 898 ("Section 441b's prohibition on corporate independent expenditures is thus a ban on speech.  As a 'restriction on the amount of money a person or group can spend on political communications during a campaign,' that statute 'necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached.'" (quoting *Buckley v. Valeo*, 424 U.S. 1, 19 (1976))).  Justice Stevens has observed that this conceptualization may be problematic:

> Money is property; it is not speech.
>
> Speech has the power to inspire volunteers to perform a multitude of tasks on a campaign trail, on a battleground, or even on a football field.  Money, meanwhile, has the power to pay hired laborers to perform the same tasks.  It does not follow, however, that the First Amendment provides the same measure of protection to the use of money to accomplish such goals as it provides to the use of ideas to achieve the same results.

*Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 398 (2000) (Stevens, J., concurring).

Both parties agree that corporate entities have the same First Amendment right as individuals to engage in unlimited independent political expenditures.  *See* Def.'s Opp'n at 1 (stating that "a corporation's First Amendment right to finance independent campaign advocacy" is "undisputed and not at issue here").  The Supreme Court established that principle nearly three years ago in *Citizens United*.  *See* 130 S. Ct. at 909 ("[W]e now conclude that independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption.").  The D.C. Circuit has also established that other campaign finance regulations are unconstitutional as applied to *non-connected* political committees (*i.e.*, political committees not established by a candidate, political party, labor union, or corporation).  In *EMILY's List*—a case decided shortly before *Citizens United*—the D.C. Circuit held that non-connected political committees, which make direct contributions to candidates and political parties, have a constitutional right also to accept unlimited contributions to finance "expenditures—such as [ballot initiative] advertisements, get-out-the-vote efforts, and voter registration drives," so long as they "ensure, to avoid circumvention of individual contribution limits by [their] donors, that [their] contributions to parties or candidates come from a hard-money account."  *See EMILY's List*, 581 F.3d at 12.[14]  Six months later, shortly after *Citizens United* was decided, the D.C. Circuit held in *SpeechNow* that the contribution limits in 2 U.S.C. § 441a(a) were unconstitutional as applied to contributions made by individuals to a non-connected political committee that made only independent expenditures because "the government can have no anti-corruption interest in limiting contributions to independent expenditure-only organizations."  *SpeechNow*, 599 F.3d at 695–96 ("The contribution limits of 2

---

[14] In *EMILY's List*, the D.C. Circuit held unconstitutional several FEC regulations that required non-profit entities registered as political committees to spend "hard money" to pay for the costs of engaging in certain political expenditures (*e.g.*, generic voter turnout and registration drives, generic party advocacy) and limited the manner in which such groups could solicit funds used to support or oppose the election of a clearly identified federal candidate. *See EMILY's List*, 581 F.3d at 16–18.

U.S.C. § 441a(a)(1)(C) and 441a(a)(3) violate the First Amendment by preventing [individuals] from donating to SpeechNow in excess of the limits by prohibiting SpeechNow from accepting donations in excess of the limits."). Finally, in *Carey*, another Judge on this Court held that a non-connected political committee may operate simultaneously as both a multicandidate political committee (making direct candidate contributions) and an independent expenditure-only political committee by establishing separate bank accounts for each activity. *See Carey*, 791 F. Supp. 2d at 130–32.

A number of precepts—some broad, others narrow—can be derived from this body of recent case law. First, *EMILY's List* and *Carey* have endorsed the hybridization of political committees—at least when such political committees are not connected to a candidate, political party, corporation, or labor union. In other words, "[t]he constitutional principles that govern . . . a hybrid non-profit entity follow ineluctably from the well-established principles governing the other two categories of non-profits," which either (1) make only direct contributions to candidates or (2) make only "expenditures for political activities."[15] *EMILY's List*, 581 F.3d at 12. An important aspect to acknowledge about *EMILY's List*, however, is that although it began with a very broad discussion of First Amendment principles, the Circuit's holding was ultimately quite narrow. The case invalidated certain FEC regulations because they required a non-connected, non-profit political committee to use its hard-money (*i.e.*, direct candidate and party contribution) account to pay for certain soft-money activities, namely "expenditures such as advertisements [about ballot initiatives], get-out-the-vote efforts, and voter registration drives." *Id.* at 16. The Court's holding was that "non-profits may not be forced to use their hard money

---

[15] The Circuit in *EMILY's List* was careful not to use the statutory term of art "independent expenditure," which is an expenditure "expressly advocating the election or defeat of a clearly identified candidate," 2 U.S.C. § 431(17), because the plaintiff in in *EMILY's List* did not engage in any express advocacy communications that would have been considered "independent expenditures." The Court instead referred more generally to "expenditures for political activities" or simply "expenditures." *See EMILY's List* 581 F.3d at 6–9, 11–12.

accounts" to pay for such expenditures.  *Id.*  Thus, *EMILY's List* clearly announced that *some* level of hybridization is acceptable for registered political committees, but the Court left open the question of how much hybridization is too much.

*Carey*, in turn, extended *EMILY's List*.  The court in *Carey* held that a non-connected political committee could combine direct contribution activities with not only generic political expenditures but also "independent expenditures," which by definition are expenditures that "expressly advocat[e] the election or defeat of a clearly identified candidate."  *Carey*, 791 F. Supp. 2d at 132; *see also*  2 U.S.C. § 431(17) (defining "independent expenditure").  The "soft money" expenditures in *EMILY's List* are distinct from the express advocacy contained in independent expenditures, *see, e.g.*, *Citizens United*, 130 S. Ct. at 910–11 ("This case, however, is about independent expenditures, not soft money."),[16] yet *Carey* did not distinguish between the express advocacy communications it was presented with and the generic soft-money expenditures addressed in *EMILY's List*.  On the contrary, the court in *Carey* concluded that "[the plaintiff] and EMILY's List are identical in that regard."  *Id.* at 130.  *Carey* also dismissed any corruption concerns that might be present with a hybrid political committee that makes both direct candidate contributions and express advocacy communications, citing the holdings of *Citizens United* and *SpeechNow*:  independent expenditures do not give rise to corruption or the appearance of corruption.  *See id.* at 135 (citing *Citizens United*, 130 S. Ct. at 909 and *SpeechNow*, 599 F.3d at 693).  The court observed that:  "*EMILY's List* specifically addressed a hybrid nonprofit entity that both made independent expenditures and contributed directly to

---

[16] *See also McConnell v. FEC*, 540 U.S. 93, 123–24 (2003) (noting that "[political] parties could also use soft money to defray the costs of 'legislative advocacy media advertisements,' even if the ads mentioned the name of a federal candidate, so long as they did not expressly advocate the candidate's election or defeat"); *EMILY's List*, 581 F.3d at 12 n.11 ("[U]nder *Austin* [*v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990)], the soft-money account into which [corporate and labor union] donations are deposited cannot be used to fund express-advocacy election activities that for-profit corporations and unions are themselves banned from conducting.").

federal candidates, campaigns, and parties—and found no problem." *Id.*[17]  In sum, *EMILY's List* approved of some hybridization for non-connected political committees, but the D.C. Circuit has yet to endorse the expansion of allowable hybrid activity announced in *Carey*.

The second precept to glean from these cases is the genesis of so-called "Super PACs"— political committees that can raise unlimited money to engage in unlimited electioneering communications, so long as their activities are not made "in cooperation, consultation, or concert, with, or at the request or suggestion of" a candidate, his or her authorized political committee, or a national, State, or local committee of a political party.  2 U.S.C. § 441a(7)(B). These "Super PACs" are permitted to exist by virtue of two cases.  The first is the Supreme Court's decision in *Citzens United*, which held that corporations could not be prevented from engaging in *their own* unlimited political speech funded from the corporation's general treasury so long as that speech is in the form of independent expenditures.  *See Citizens United*, 130 S. Ct. at 909.  The second is the D.C. Circuit's decision in *SpeechNow*, which held that individuals can contribute unlimited amounts to a non-connected political committee, as long as the political committee is engaged solely in independent expenditures.  *See SpeechNow*, 599 F.3d at 694 ("In light of the [Supreme] Court's holding as a matter of law that independent expenditures do not corrupt or create the appearance of *quid pro quo* corruption, contributions to groups that make only independent expenditures also cannot corrupt or create the appearance of corruption."). Essentially, as long as a non-connected political committee engages only in independent expenditures, it is now permitted to receive unlimited amounts of money from both individuals and corporations.  *See, e.g.*, FEC Advisory Op. 2010-11, 2010 WL 3184269, at *2 (July 22,

---

[17] This sentence in particular suggests that the *Carey* court felt constrained by the Circuit's precedent in *EMILY's List* to decide the case as it did.  Additionally, "[t]he *Carey* court was constrained by the D.C. Circuit's recent decision in [*SpeechNow*], holding unconstitutional contribution limits to independent expenditure groups." *McCutcheon v. FEC*, No. 12-1034, 2012 WL 4466482, at *3 n.2 (D.D.C. Sept. 28, 2012) (three-judge panel).

2010) ("Following *Citizens United* and *SpeechNow*, corporations, labor organizations, and political committees may make unlimited independent expenditures from their own funds, and individuals may pool unlimited funds in an independent expenditure-only political committee.  It necessarily follows that corporations, labor organizations and political committees also may make unlimited contributions to organizations . . . that make only independent expenditures." (footnote omitted)).

Importantly, in allowing unlimited money to flow into the electoral process for express advocacy, both *SpeechNow* and *Citizens United* heavily emphasized the non-coordinated nature of independent expenditures, which serves as an essential counterweight to concerns about corruption or the appearance of corruption.  *See Citizens United*, 130 S. Ct. at 908 ("'The absence of prearrangement and coordination of an expenditure with the candidate or his agent . . . alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate.'" (quoting *Buckley*, 424 U.S. at 47)); *id.* at 910 ("By definition, an independent expenditure is political speech presented to the electorate that is not coordinated with a candidate."); *SpeechNow*, 599 F.3d at 693 ("The independence of independent expenditures was a central consideration in the Court's decision [in *Citizens United*].")); *id.* ("[A] lack of coordination diminishes the possibility of corruption.").  Hence, there can be little doubt that the *independence* of independent expenditures is the lynchpin that holds together the principle that no limits can be placed on contributions for such expenditures. If express advocacy for particular federal candidates were to lose its independence (either in reality or appearance), it stands to reason that the doctrine carefully crafted in *Citizens United* and *SpeechNow* would begin to tumble back to Earth.

The third and final precept, which loomed large behind the development of the first two precepts, is that the government's interest in preventing corruption or the appearance of corruption endures as a compelling justification to restrict certain kinds of political speech.  In particular, courts continue to recognize that preventing corruption or the appearance of corruption is sufficiently important to regulate entities that engage in direct contributions to candidates and political parties, including "multicandidate political committees," which are political committees that "ha[ve] made contributions to 5 or more candidates for Federal office." 2 U.S.C. § 441a(a)(4); *see Citizens United*, 130 S. Ct. at 908 ("The *Buckley* Court, nevertheless, sustained limits on direct contributions in order to ensure against the reality or appearance of corruption."); *SpeechNow*, 599 F.3d at 695 ("Limits on direct contributions to candidates, 'unlike limits on independent expenditures, have been an accepted means to prevent *quid pro quo* corruption.'" (quoting *Citizens United*, 130 S. Ct. at 909)); *EMILY's List*, 581 F.3d at 11 ("In order to prevent circumvention of limits on an individual donor's contributions to candidates and parties, the [Supreme] Court has held that non-profit entities can be required to make their own contributions to candidates and parties . . . out of a hard-money account that is subject to source and amount restrictions.").

Specifically, Congress explicitly carved out "multicandidate political committees" to be entities that engage in direct contributions to candidates and political parties because such direct contributions foment "the reality or appearance of corruption inherent in a system permitting unlimited financial contributions."  *Buckley*, 424 U.S. at 28; *see also* 2 U.S.C. § 441a(a)(2) (limiting contributions made by "multicandidate political committees").[18]  For this very reason,

---

[18] The Supreme Court was clear in its seminal campaign finance decision of the twentieth century (*Buckley*) that "[b]y contrast with a limitation upon expenditures for political expression, a limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication."  *Buckley*, 424 U.S. at 20.  This is because "[a] contribution

the Supreme Court has long validated the government's ability to restrict the amount of

contribution that may be given to multicandidate political committees.  *See Cal-Med*, 453 U.S. at

203 (Blackmun, J., concurring) ("Multicandidate political committees are therefore essentially

conduits for contributions to candidates, and as such they pose a perceived threat of actual or

potential corruption."); *see also Thalheimer v. City of San Diego*, 645 F.3d 1109, 1120 (9th Cir.

2011) (noting that "the direct donor relationship" of a multicandidate political committee

"present[s] a risk of actual or apparent quid pro quo corruption" (citing *Cal-Med*, 453 U.S. at

197)).  The Supreme Court has also clearly recognized that "[o]f almost equal concern as the

danger of actual quid pro quo arrangements is the impact of the appearance of corruption

serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support," and hence although "contributions *may result* in political expression if spent by a candidate or an association to present views to the voters, the transformation of contributions into political debate involves speech *by someone other than the contributor*."  *Id.* at 21 (emphasis added).

In light of this distinction, any political contribution enjoys, *ex ante*, a lesser quantum of First Amendment protection than any type of political expenditure.  *See id.* at 23 ("[E]xpenditure ceilings impose significantly more severe restrictions on protected freedoms of political expression and association than do . . . limitations on financial contributions."); *see also McConnell*, 540 U.S. at 152 n.48 ("Given FECA's definition of 'contribution,' the $5,000 and $25,000 limits restricted not only the source and amount of funds available to parties and political committees to make candidate contributions, but also the source and amount of funds available to engage in express advocacy and numerous other noncoordinated expenditures."), *overruled in part on other grounds by Citizens United*, 558 U.S. 310; *Cal-Med*, 453 U.S. at 196 (plurality opinion) ("[T]he 'speech by proxy' that [a non-profit] seeks to achieve through its contributions to [a PAC] is not the sort of political advocacy that this Court in *Buckley* found entitled to full First Amendment protection."); *McCutcheon*, 2012 WL 4466482, at *3 ("Every contribution limit may 'logically reduce[] the total amount that the recipient of the contributions otherwise could spend,' but for now, 'this truism does not mean limits on contributions are simultaneously considered limits on expenditures that therefore receive strict scrutiny." (quoting *Republican Nat'l Comm. v. FEC*, 698 F. Supp. 2d 150, 156 (D.D.C. 2010))); Richard Wolf Hess, *No Fair Play for Millionaires?  McCain-Feingold's Wealthy Candidate Restrictions and the First Amendment*, 70 U. Chi. L. Rev. 1067, 1077 (2003) ("The *Buckley* Court ratified contribution limits by recognizing that although contribution limits do affect free speech rights, contributions are less deserving of protection than other forms of political speech.  The *Buckley* Court considered contributions as derivative, or conduit-type speech . . . .").  For this reason, the *Buckley* Court was ultimately untroubled by limits on political contributions because the overall effect of contribution limits "is merely to require candidates and political committees to raise funds from a greater number of persons."  *See Buckley*, 424 U.S. at 21–22.

The Supreme Court, however, started to narrow *Buckley*'s critical distinction, without explanation, only five years after the case was decided.  *See Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 296–97 (1981) ("*Buckley* identified a single narrow exception to the rule that limits on political activity were contrary to the First Amendment.  The exception relates to the perception of undue influence of large contributors to a *candidate*."). *SpeechNow* followed the Supreme Court down this path, saying that "the limits upheld in *Buckley* were limits on contributions made *directly to candidates*."  *SpeechNow*, 599 F.3d at 695.  Although this narrowing of *Buckley* is at odds with language from other Supreme Court precedents cited above (*Cal-Med* and *McConnell*), the D.C. Circuit's narrow interpretation of *Buckley* binds this Court.

stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions." *Buckley*, 424 U.S. at 27.

This sets the stage for the constitutional question presently before the Court:  Does the government have a sufficiently compelling interest in limiting contributions to (and solicitations by) connected political committees that engage in both express advocacy communications and direct candidate contributions?  All that such a hybrid organization needs to do, according to *Carey*, is establish two separate bank accounts—one for direct contributions and one for independent expenditures—and *voilà*:  the appearance of corruption and undue influence magically disappear.  Yet, the allowances of such hybrid PACs transmogrify Congress's intent in compartmentalizing "multicandidate political committees" from other kinds of political associations.  When a PAC gives directly to candidates with its right hand and engages in express advocacy with its left hand, the risk that the PAC's hybrid spending will appear corrupting and corrosive is manifest.  When the public sees a hybrid PAC hand a check to a candidate or party leader while that PAC simultaneously spends unlimited amounts on highly visible electioneering communications that directly advocate for that candidate's election, the façade of "independence"—even if formally observed by using separate funds or accounts— appears non-existent to the public.  Thus, the "belief that *quid pro quo* arrangements can be neatly demarcated from other improper influences does not accord with the theory or reality of politics." *Citizens United*, 130 S. Ct. at 961 (Stevens, J., dissenting); *see also id.* at 962 ("[A] large majority of Americans (80%) are of the view that corporations and other organizations that engage in electioneering communications, which benefit specific elected officials, receive special consideration from those officials when matters arise that affect these corporations and

organizations." (quoting *McConnell v. FEC*, 251 F. Supp. 2d 176, 623–24 (D.D.C. 2003),

*overruled in part by* 540 U.S. 93)).[19]

The instant case lies at the intersection of these three precepts, addressing whether a

single connected PAC is permitted to engage in limited direct contributions funded from one

bank account and simultaneously engage in unlimited express advocacy communications funded

from another bank account.  With these precedents in mind, the Court will now assess the

probability of success of the plaintiffs' constitutional claims.

### 2.    *Contribution Limits*

First, the plaintiffs challenge the constitutionality of the contribution limits in 2 U.S.C.

§§ 441a(a)(1)(C) and 441a(a)(3) as applied to SSFs that make both direct contributions and

express advocacy communications.  Those provisions prohibit making contributions to any

"other political committee" (including SSFs) that exceed $5,000 in any calendar year and also

prohibit making contributions that aggregate more than $57,500 biennially.[20]  Plaintiffs Glengary

LLC and Todd Cefaratti claim that they are both interested in making contributions to the

Leadership Fund that exceed these limits and are prohibited from doing so by these restrictions.

*See* Compl. ¶¶ 25–26, 71.  Those contribution limits for individuals, such as plaintiff Cefaratti,

have already been held unconstitutional as applied to non-connected political committees.  *See*

*SpeechNow*, 599 F.3d at 696.

---

[19] The Court of Appeals' holding in *SpeechNow*, which struck down as unconstitutional limits on individuals' contributions to independent expenditure-only groups, did not account for the newly minted approval of "hybrid" PACs in *EMILY's List*.  Indeed, *SpeechNow* never even cited to *EMILY's List*.  Although *SpeechNow* purported to limit its holding to "contributions to independent expenditure-only organizations," 599 F.3d at 696, the plaintiffs invite the Court to conclude that the dual-account model supplied by *EMILY's List* for hybrid PACs be read in tandem with *SpeechNow* to expand *SpeechNow*'s holding to any organization that engages in some amount of independent expenditure activity.  The Court declines the plaintiffs' invitation.

[20] The $57,500 biennial cap applies to all contributions that are not made "to candidates and the authorized committees of candidates," though of the $57,500 cap no more than $37,500 "may be attributable to contributions to political committees which are not political committees of national political parties."  2 U.S.C. § 441a(a)(3)(B).

The plaintiffs contend that the broad-based discussion of contribution limits in *SpeechNow* and *EMILY's List* dictate a result in the plaintiffs' favor. Those cases are distinguishable, however, and therefore do not control the outcome of the instant case. First, although *EMILY's List* was a facial challenge, the regulations challenged in that case only dealt with solicitation and allocation restrictions, not contribution limits. *EMILY's List*, 581 F.3d at 15–18 (outlining provisions of challenged regulations). Hence, to the extent the Court's analysis touched upon contribution limits, it was pure dicta. Second and perhaps more importantly, although the non-profit plaintiff in *EMILY's List* engaged in "expenditures," none of the expenditures at issue involved express advocacy for or against a clearly identified federal candidate. Rather, the expenditures involved in *EMILY's List* were either issue-based advocacy or voter turnout and registration activities. *See id.* at 12 (noting that EMILY's List "makes expenditures for advertisements, get-out-the-vote efforts, and voter registration drives"); *EMILY's List v. FEC*, 569 F. Supp. 2d 18, 33 (D.D.C. 2008) (noting that advertisements at issue were "five advertisements supporting two ballot initiatives in Missouri that . . . do not contain any references to clearly identified federal candidates"), *reversed by* 481 F.3d 1 (D.C. Cir. 2009).[21]

Thus, *EMILY's List* did not address contribution limits, and in particular it did not address the potential anti-corruption interests implicated by contribution limits on hybrid PACs that engage in both direct contributions and express advocacy—a critical distinction from the facts of

---

[21] The Circuit panel in *EMILY's List* was also very careful to emphasize repeatedly that its "constitutional analysis of non-profits applie[d] only to *non-connected* non-profits." *EMILY's List*, 581 F.3d at 22 n.21 (emphasis in original); *see also id.* at 8 ("[T]his case concerns the FEC's regulation of *non-profit entities* that are not connected to a candidate, party, or for-profit corporation."); *id.* at 16 n.15 ("Our constitutional analysis of donations and spending limits applies both to non-connected non-profits registered as political committees with the FEC and to non-connected non-profits that are not so registered."). The Circuit did not explicitly state why non-connectedness was important to its analysis, though the repeated emphasis on non-connectedness implies that it was in fact important. Nevertheless, this Court will not venture to speculate as to the doctrinal importance of the non-connected nature of the non-profit at issue in *EMILY's List*, other than to observe that the entity at issue in the instant case (the Leadership Fund) is, by contrast, a *connected* political committee.

the instant case.  The distinction is critical primarily because express advocacy has an inherently stronger nexus to particular candidates, which materially alters the constitutional analysis of hybrid political committees.  *See FEC v. Mass. Citizens for Life, Inc.* ("*MCFL*"), 479 U.S. 238, 249 (1986) ("*Buckley* adopted the 'express advocacy' requirement to distinguish discussion of issues and candidates from more pointed exhortations to vote for particular persons."); *Wis. Right to Life, Inc. v. FEC*, 466 F. Supp. 2d 195, 209 (D.D.C. 2006) ("The common denominator between express advocacy and its functional equivalent, as the Supreme Court defined it in *McConnell*, is the link between the words and images used in the ad and the fitness, or lack thereof, of the candidate for public office. . . . [I]t is the absence of that link which obviates the likelihood of political corruption and public cynicism in government where the ad, on its face, is devoid of any language the purpose of which is advocacy either for or against a particular candidate for federal office.").  Additionally, *EMILY's List* did not consider the propriety of "hybrid" PACs in a post-*Citizens United* world of unlimited corporate funding—a factor that does, and should, likewise modify the anti-corruption calculus.[22]

Similarly, *SpeechNow* is distinguishable from the instant case because it involved limits on contributions by individuals to unincorporated non-profit associations that *only* engage in independent expenditures.  *See SpeechNow*, 599 F.3d at 689 ("[W]e hold that the contribution limits of 2 U.S.C. § 441a(a)(1)(C) and 441a(a)(3) are unconstitutional as applied to individuals' contributions to SpeechNow."); *see also id.* at 696 ("[W]e only decide these questions as applied to contributions to SpeechNow, an independent expenditure-only group.").  Clearly, *SpeechNow* does not control the instant case because this case deals with a "hybrid" PAC that seeks to

---

[22] This is notwithstanding the partially concurring opinion in *EMILY's List*, which observed that the results of the majority's decision "are in tension—perhaps irreconcilable tension—with *McConnell*." *EMILY's List*, 581 F.3d at 39 (Brown, J., concurring); *see also id.* at 37 ("This novel argument [that hybrid political committees may exist] is not without considerable charm, but one must read *Cal-Med* with a squint to see that holding.").

engage in *both* independent expenditures and direct candidate contributions.[23]  *See* Compl. ¶ 23 (noting that the Leadership Fund "wants to make contributions to federal candidates" and "is also interested in making independent expenditures").  Indeed, *SpeechNow* observed that "[t]he independence of independent expenditures was a central consideration in the [Supreme] Court's decision [in *Citizens United*]," 599 F.3d at 693, though as the Court's preceding analysis makes clear, the "independence" of hybrid PAC expenditures is suspect.

"The Supreme Court has recognized only one interest sufficiently important to outweigh the First Amendment interests implicated by contributions for political speech:  preventing corruption or the appearance of corruption."  *Id.* at 692; *see also Colo. Republican Fed. Campaign Comm. v. FEC*, 518 U.S. 604, 615 (1996) ("[R]easonable contribution limits directly and materially advance the Government's interest in preventing exchanges of large financial contributions for political favors.").  As the Court in *Buckley* and the plurality in *Cal-Med* articulated, the government's interest in "deal[ing] with the reality or appearance of corruption inherent in a system permitting unlimited financial contributions," is directly implicated when contributions are made to groups that in turn make direct contributions to candidates or political parties.  *Buckley*, 424 U.S. at 28; *see also Cal-Med*, 453 U.S. at 194 (plurality opinion) ("[Contribution] limitations serve[] the important governmental interests in preventing the corruption or appearance of corruption of the political process that might result if such contributions were not restrained.").  This anti-corruption interest continues to justify the $5,000 annual cap on hybrid PACs like the Leadership Fund that desire to make both independent electioneering expenditures, including express advocacy communications, and direct

---

[23] It also appears that the plaintiffs in *SpeechNow* and *EMILY's List* were not established, administered, or subsidized by a corporation and thus were "non-connected," unlike the Leadership Fund in the instant action.

contributions to federal parties and candidates.  The Supreme Court observed as much in *Cal-Med* when the plurality held:

> If the First Amendment rights of a contributor are not infringed by limitations on the amount he may contribute to a campaign organization which advocates the views and candidacy of a particular candidate, the rights of a contributor are similarly not impaired by limits on the amount he may give to a multicandidate political committee . . . which advocates the views and candidacies of a number of candidates.

*Cal-Med*, 453 U.S. at 183–84 (plurality opinion) (citation omitted).

As discussed above, the government's interest in preventing the appearance of political corruption and undue influence is at its zenith when individuals and organizations give money directly to political candidates and political parties.  As the Supreme Court prophetically stated over thirty-five years ago:

> Under a system of private financing of elections, a candidate lacking immense personal or family wealth must depend on financial contributions from others to provide the resources necessary to conduct a successful campaign.  The increasing importance of the communications media and sophisticated mass-mailing and polling operations to effective campaigning make the raising of large sums of money an ever more essential ingredient of an effective candidacy.  To the extent that large contributions are given to secure a political *quid pro quo* from current and potential office holders, the integrity of our system of representative democracy is undermined.

*Buckley*, 424 U.S. at 26–27.  This has been the justification for contribution limits to multicandidate political committees for decades.  *See, e.g.*, *Cal-Med*, 153 U.S. at 197–98 (plurality opinion) (holding that limits on contributions to multicandidate political committees "further the governmental interest in preventing the actual or apparent corruption of the political process").

When a single entity is allowed to make both limited direct contributions and unlimited independent expenditures, keeping the bank accounts for those two purposes separate is simply insufficient to overcome the appearance that the entity is in cahoots with the candidates and

parties that it coordinates with and supports.  Although such an entity may maintain separate

bank accounts, it need not maintain separate management or hold itself out to the public as

engaging in two distinct activities.  Thus from the perspective of any citizen who does not

scrutinize the entity's bank statements, all of the entity's spending (direct contributions and

express advocacy communications) is coming from the same place.  *See N.C. Right to Life, Inc.*

*v. Leake*, 525 F.3d 274, 336 (4th Cir. 2008) (Michael, J., dissenting) ("It is hard to understand

how [an independent expenditure-only PAC] could, whether intentionally or not, avoid

incorporating the coordinated campaign strategies used by [its affiliated direct contribution-only

PAC] into its own ostensibly independent campaign work.  Similarly, it is hard to understand

how a donor, approached by the same fundraiser on behalf of both [PACs], could not believe that

his or her contributions to each would be linked."); *see also Vt. Right to Life Comm., Inc. v.*

*Sorrell*, No. 2:09-CV-188, 2012 WL 2370445, at *28 (D. Vt. June 21, 2012) (noting that "the

structural melding" between an independent expenditure-only PAC and a direct contribution

PAC "leaves no significant functional divide between them for purposes of campaign finance

law," and their "nearly complete organizational identity poses serious questions").  To conclude

that a "hybrid" PAC's direct contributions to (and attendant coordination with) candidates and

parties do not infect, or appear to infect, all of its operations in the political arena is naïve and

simply out of touch with the American public's clear disillusionment with the massive amounts

of private money that have dominated the political system, particularly since *Citizens United*.[24]

---

[24] *See* Brennan Ctr. for Justice, *National Survey:  Super PACs, Corruption, and Democracy* 2–3 (2012) (reporting
that 73% of respondents in national poll agreed that "there would be less corruption if there were limits on how
much could be given to Super PACs," 77% "agreed that members of Congress are more likely to act in the interest
of a group that spent millions to elect them than to act in the public interest," and 65% said that "they trust
government less because big donors to Super PACs have more influence than regular voters"); *see also* Morgan
Little, *Poll:  Americans Largely in Favor of Campaign Spending Limitations*, L.A. TIMES (Sept. 16, 2012) (reporting
that recent national poll conducted by the Associated Press and the National Constitution Center found that 83% of
Americans "believe there should be at least some limits on the amount of money corporations, unions and other

*See Citizens United*, 130 S. Ct. at 964 (Stevens, J., dissenting) ("A democracy cannot function effectively when its constituent members believe laws are being bought and sold.").  Although "[a] non-profit that makes expenditures to support federal candidates does not suddenly forfeit its First Amendment rights when it decides also to make direct contributions to parties or candidates," *EMILY's List*, 581 F.3d at 12, such a hybrid PAC also does not lose its status as a multicandidate political committee merely by making independent expenditures.

This is, of course, not to say that an organization like the Leadership Fund forfeits its First Amendment rights simply by virtue of wanting to make both direct contributions and independent electioneering expenditures.  Those rights remain unscathed.  Further, the burden on the plaintiffs to comply with the current contribution limits is minimal.  If banding together to engage in unlimited political speech is their goal, the plaintiffs could easily form an independent expenditure-only PAC (*i.e.*, a Super PAC) and receive contributions in unlimited amounts. *Compare SpeechNow*, 599 F.3d at 697 ("[P]laintiffs argue that the additional burden that would be imposed on SpeechNow if it were required to comply with the organizational and reporting requirements applicable to political committees is too much for the First Amendment to bear. We disagree."), *with* Pls.' Reply Mem. in Supp. Mot. Prelim. Inj. ("Pls.' Reply") at 11, ECF No. 7 ("The FEC cannot require [the Leadership Fund] to clone itself to make independent expenditures.").  Therefore, the contribution limits at 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3) are constitutional as applied to the Leadership Fund, insofar as the Leadership Fund operates as a single entity that makes both direct contributions and express advocacy communications.[25]

organizations are permitted to contribute to groups seeking to influence the outcome of presidential and congressional races").

[25] As discussed above, this holding does not prevent the Leadership Fund or any of the other plaintiffs from engaging in unlimited independent expenditures.  It merely imposes a narrow limit on the mechanism through which they may do so.  For example, STI could establish a second connected PAC that engaged in only independent

### 3.        *Solicitation Restrictions*

Next, the plaintiffs challenge the constitutionality of the FECA's restrictions on the group

of people from whom an SSF may solicit contributions.  Section 441b(b)(4)(A)(i) of the FECA

makes it unlawful "for a corporation, or a separate segregated fund established by a corporation,

to solicit contributions to such a fund from any person other than its stockholders and their

families and its executive or administrative personnel."  SSFs may also solicit the rank-and-file

employees of their connected corporations as long as the solicitations are:  (1) made in writing;

(2) addressed to the employees at their residence; (3) made only twice per calendar year; and

(4) designed such that the SSF and its connected corporation "cannot determine who makes a

contribution of $50 or less as a result of such solicitation and who does not make such a

contribution."  *Id.* § 441b(b)(4)(B).  The plaintiffs state, however, that they do not challenge the

validity of these latter restrictions, which regulate the manner in which rank-and-file employees

may be solicited.  *See* Pls.' Mem. in Supp. Mot. Prelim. Inj. ("Pls.' Mem.") at 3, ECF No. 4-1

("Plaintiffs do not challenge . . . the prohibition on soliciting employees of the SSF not in the

restricted class more than twice annually subject to certain restrictions." (citing 2 U.S.C.

§ 441b(b)(4)(B))).  Rather, the plaintiffs seek to expand the scope of people who may be

solicited beyond the limited group of individuals associated with the host corporation through an

ownership or employment interest.  In essence, however, the direct solicitation restrictions for

rank-and-file employees would be swallowed if the relief sought by the plaintiffs were granted

(and STI and the Leadership Fund were permitted to solicit from the general public) because the

general public necessarily would include rank-and-file employees.

---

expenditures.  Also, any or all of the plaintiffs could establish a non-connected political committee that engages in
only independent expenditures.

Soliciting money for political spending is distinct from either making political contributions or making independent political expenditures, though all three activities enjoy First Amendment protection.  The Supreme Court has held that "[s]oliciting financial support is undoubtedly subject to reasonable regulation," so long as that regulation is "undertaken with due regard for the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech."  *Vill. of Schaumberg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980); *see also Friends of the Vietnam Veterans Mem'l v. Kennedy*, 116 F.3d 495, 497 (D.C. Cir. 1997) ("The cases protecting the right to solicit contributions in a public forum do so not because the First Amendment contemplates the right to raise money, but rather because the act of solicitation contains a communicative element." (citing *Village of Schaumberg*, 444 U.S. at 632))  Therefore, the plaintiffs go too far in arguing that, "After *Citizens United* and related cases all associations have a fundamental right to associate by soliciting contributions to fund independent expenditures."  Pls.' Reply at 14.

It is not completely clear what level of scrutiny applies when examining the constitutional validity of restrictions on solicitation activities.  A number of courts have held that, so long as the solicitation restrictions are content neutral, they need not withstand strict scrutiny. *See, e.g.*, *McConnell*, 540 U.S. at 138–39 (applying less than strict scrutiny to solicitation restriction because it "in no way alter[ed] or impair[ed] the political message 'intertwined' with the solicitation"); *EMILY's List*, 581 F.3d at 35 (Brown, J., concurring) ("After *McConnell*, . . . solicitation rules are subject only to this lesser scrutiny."); *Blount v. SEC*, 61 F.3d 938, 941–42 (D.C. Cir. 1995) ("The intensity with which we scrutinize [a solicitation restriction] depends on whether the rule is content-based, eliciting 'strict' scrutiny, or content-neutral, eliciting only 'intermediate' scrutiny.").  In the instant case, the solicitation restrictions appear to be content

neutral because they are "justified without reference to the content of the regulated speech," *see Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976), but the Court need not decide this question because, as the subsequent discussion reveals, the solicitation restrictions challenged by the plaintiffs would survive even strict scrutiny.

Although the Court is mindful that solicitation activities are "characteristically intertwined with informative and perhaps persuasive speech," *Village of Schaumberg*, 444 U.S. at 632, the plaintiffs have altogether failed to allege or describe how their proposed solicitation activities would include a "communicative element."[26]  *See Kennedy*, 116 F.3d at 497.  The plaintiffs have discussed their proposed solicitation activities solely in terms of how those solicitations will allow them to raise particular amounts of money, *see, e.g.*, Compl. ¶¶ 27, 40–41, 43; Pls.' Mem. at 6 ("[The Leadership Fund] wants to solicit Mr. Ehlinger to make a $1,500 contribution to a[n] [independent expenditure-only] account . . . ."); *id.* at 10 ("[The Leadership Fund] would like to solicit contributions for its independent expenditures in amounts greater than $5,000.00 per calendar year."), but the act of soliciting money in certain amounts, by itself, does not warrant strong First Amendment protection—even if it is for the purpose of *later* engaging in protected speech.  *See Kennedy*, 116 F.3d at 497 (observing that the First Amendment does not contemplate "the right to raise money").  Nevertheless, the Court is wary of labeling the plaintiffs' proposed solicitations as pure commercial speech, particularly because this Circuit has recognized that the solicitation of campaign funds "is close to the core of protected speech." *Blount*, 61 F.3d at 941 (citing *Village of Schaumberg*, 444 U.S. at 632).  A restriction on solicitation activity thus generally "cannot be sustained unless it serves a sufficiently strong,

---

[26] The FEC has stated that one of its concerns is that the Leadership Fund will solicit the general public through expressive or persuasive conduct, but the plaintiffs do not address this possibility in their Complaint or their briefing.  *See* Def.'s Opp'n at 16 (noting "the damage that would result from STI's proposal to pay for undisclosed *solicitations* of the general public—communications that can themselves support or oppose federal candidates").

subordinating interest that the [government] is entitled to protect." *Village of Schaumberg*, 444 U.S. at 636; *see also id.* at 637 (noting that restriction on solicitation activities "may serve [the government's] legitimate interests, but it must do so by narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms").[27]

The Supreme Court established long ago, however, that the federal government has a number of "sufficiently strong" interests in limiting the solicitation activities of SSFs. *See NRWC*, 459 U.S. at 206–10. The plaintiffs are incorrect in arguing that the Supreme Court's decision in *NRWC*, upholding the FECA's solicitation restrictions, was only "based upon an anti-distortion rationale thoroughly rejected by the Supreme Court in *Citizens United*." Pls.' Reply. at 14 n.12. *NRWC* discussed the constitutionality of the very same solicitation restrictions that that plaintiffs challenge in the instant action. The plaintiff in *NRWC* challenged the solicitation restrictions in 2 U.S.C. § 441b(b)(4)(A), arguing (as the plaintiffs do here) that they restricted the ability of the corporation's SSF to associate with people who shared its political beliefs. *See NRWC*, 459 U.S. at 206–07; *see also* Pls.' Reply at 14 (arguing for "fundamental right to associate by soliciting contributions"). The Court rejected this challenge on several grounds. First, the Court pointed to an anti-distortion rationale, *i.e.*, ensuring that "substantial aggregations of wealth amassed by the special advantages which go with the corporate form of organization should not be converted into political 'war chests,'" as well as a shareholder protection rationale,

---

[27] The plaintiffs seem to believe that the right to engage in unrestricted solicitation of funds follows ineluctably from the holding in *Citizens United* because, in the plaintiffs' view, every campaign finance regulation that has any nexus to independent expenditures is also unconstitutional. *See, e.g.*, Pls.' Reply at 14. Yet, this is clearly not so. For example, courts have consistently upheld the FECA's organizational, reporting, and disclosure requirements— requirements that continue to apply to independent expenditure-only organizations, despite the fact that compliance with such requirements imposes costs that necessarily divert organizational resources away from independent expenditure activity. *See Citizens United*, 130 S. Ct. at 916 ([D]isclosure permits citizens and shareholders to react to the speech of corporate entities in a proper way. This transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages."); *SpeechNow*, 599 F.3d at 697 (rejecting plaintiffs' argument that organizational and reporting requirements on political committees are violative of the First Amendment).

*i.e.*, "to protect the individuals who have paid money into a corporation or union for purposes other than the support of candidates from having that money used to support political candidates to whom they may be opposed," and found that both were "sufficient to justify the [solicitation restrictions] at issue." *NRWC*, 459 U.S. at 207–08.  Significantly, the Court then went on to discuss a third key rationale that supported the solicitation restrictions:  "the importance of preventing both the actual corruption threatened by large financial contributions and the eroding of public confidence in the electoral process through the appearance of corruption." *Id.* at 208.  The Court stated that "[i]n order to prevent both actual and apparent corruption, Congress aimed a part of its regulatory scheme at corporations" and that "[w]hile § 441b restricts the solicitation of corporations and labor unions without great financial resources, as well as those more fortunately situated, we accept Congress's judgment that it is the potential for such [corrupting] influence that demands regulation." *Id.* at 209–10.  Therefore, contrary to the plaintiffs' assertion, the Supreme Court in *NRWC* also relied upon the well-established and compelling anti-corruption rationale in upholding § 441b's solicitation restrictions.  Nothing in *Citizens United* or any other Supreme Court case has displaced the holding in *NRWC*, and this Court is bound to follow it here.

Yet another important consideration implicated by the solicitation restrictions challenged in this case is the government's interest in protecting the First Amendment rights of a corporation's employees.  This concern was not addressed by the majority in *Citizens United* or the Court of Appeals in *EMILY's List* and *SpeechNow*, but it is vitally important to the health of American democracy.  *See NRWC*, 459 U.S. at 206 (observing that FECA's restrictions on SSF solicitations were intended to prevent such solicitations from "coerc[ing] members of the corporation holding minority political views").  As Justice Stevens noted in his piercing dissent,

"[t]he majority seems oblivious to the simple truth that laws such as [the FECA] do not merely pit the anticorruption interest against the First Amendment, but also pit competing First Amendment values against each other."  *Citizens United*, 130 S. Ct. at 976 (Stevens, J., dissenting).  "The Court's blinkered and aphoristic approach to the First Amendment may well promote corporate power at the cost of the individual and collective self-expression the Amendment was meant to serve."  *Id.* at 977.

Providing corporations with an unlimited political voice may bring more and louder voices to the national political dialogue as the *Citizens United* majority repeatedly emphasized and lauded, but allowing unlimited amplification of corporate political speech will also inevitably chill the political speech of corporate employees whose views diverge from their corporate employers.  The plaintiffs assure the Court that they will abide by the FECA's other applicable solicitation restrictions, such as the restriction on only soliciting rank-and-file employees twice per year under certain restrictions, "the requirement to 'inform each employee it solicits of the political purposes of [the SSF]' and 'of his right to refuse to contribute without any reprisal.'"  Pls.' Reply at 6, 16 (quoting Def.'s Opp'n at 23).  Yet, as one commentator has noted, "the inherent potential for coercion in employer-employee relationships . . . cannot simply be undone by prohibiting explicit or implicit threats or discrimination."  Paul M. Secunda, *Addressing Political Captive Audience Workplace Meetings in the Post-Citizens United Environment*, 120 YALE L.J. ONLINE 17, 24 (2010).  Rather, "it is in the best interest of all involved to keep political discussions and partisanship out of the public and private workplace." *Id.*  The relief sought by the plaintiffs would do just the opposite.  As noted above, allowing STI and the Leadership Fund to solicit funds from the general public would essentially do away with the FECA's strict limitations on how corporate employees may be solicited because all corporate

employees are also members of the general public.  The danger that rank-and-file employees would be exposed to repeated public solicitations from their employer's PAC[28]—via direct mail, radio, television, or other public media of the corporation's choice—and would thereby feel coerced to contribute or adopt a particular political viewpoint at work, represents an unacceptable risk of infringing those employees' First Amendment rights.  Preventing such an outcome would essentially require rewriting the statute to account for the existence of general-public solicitation, which is a task for the Congress, not this Court.

The solicitation restrictions in § 441b are also narrowly drawn to serve the foregoing governmental interests because the restrictions are tailored to match the special benefit that Congress extended to SSFs—exempting all funds used for "the establishment, administration, and solicitation of contributions to a [SSF]" from the definition of "contributions."  *See* 2 U.S.C. § 441b(b)(2)(C).  This exemption, as discussed above, evidences a delicate statutory balancing of burden and benefit:  An SSF's solicitation speech may be subsidized by its connected corporation, so long as those solicitations are limited to corporate insiders and employees.  *See id.* § 441b(b).  The statutory exemption allows connected PACs to avoid the disclosure and reporting requirements that would otherwise apply to contributions that fund political solicitations.  Consequently, donations to the general treasury of the non-profit corporation in any amount from any source may be funneled, without disclosing or reporting the amount or the source, to the connected PAC for use in solicitations.[29]  Removing the statute's restrictions on

---

[28] Corporate employees would be well aware that they are being solicited by their employer's PAC because each SSF is required to "include the name of its connected organization" in its name.  2 U.S.C. § 432(e)(5).

[29] This is yet another distinction between the instant case and *EMILY's List*.  The plaintiff in *EMILY's List*, unlike the plaintiff STI in the instant action, was registered as a political committee and thus was required to disclose the amount and source of any "contributions," *i.e.*, any monies given to the organization "for the purpose of influencing any election for Federal office."  *See* 2 U.S.C. § 431(8)(A); *EMILY's List*, 581 F.3d at 16 n.15.  STI is a 501(c)(4) non-profit that need not disclose the source or amount of any contributions to its general treasury.

the breadth of such solicitations would allow the disclosure and reporting exception to swallow the rule.

SSFs are creatures of statute—they were crafted by Congress to enjoy certain benefits that other, non-connected PACs cannot enjoy, and it is therefore eminently reasonable and important for connected PACs to abide by Congress's countervailing restriction on the universe of people to whom SSFs' solicitations may be directed. *See Cal-Med*, 453 U.S. at 201 ("[T]he segregated funds that unions and corporations may establish pursuant to § 441b(b)(2)(C) are carefully limited in [the manner and scope of their solicitations].").  The solicitation restrictions do not limit the content or frequency of the plaintiffs' solicitation messages, and therefore it would be inappropriate to upset the careful legislative balance struck in § 441b(b).  The FEC's "reasonable regulation" upon the solicitation of financial support to SSFs is therefore permissible because it exercises "due regard for the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech." *See Village of Schaumberg*, 444 U.S. at 632.

* * *

In sum, the plaintiffs have not demonstrated a likelihood of success on the merits of their claims.  Although the Court will continue to discuss the other three preliminary injunction factors in assessing the plaintiff's Motion for Preliminary Injunction, the foregoing conclusion about the merits of the plaintiffs' claims is sufficient to grant the FEC's Motion to Dismiss.  As a result, the Leadership Fund may establish two separate bank accounts that may be used for direct contributions and independent expenditures (including express advocacy).  Insofar as the Leadership Fund chooses to remain as a single entity that engages in both direct candidate contributions and express advocacy communications, however, the Leadership Fund may not solicit contributions beyond the limits on such solicitations contained in 2 U.S.C. § 441b(b)(4),

and the Leadership Fund also may not accept any contributions in excess of the limits contained in 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3).

### B.   **Irreparable Harm**

The plaintiffs claim that they will suffer irreparable harm if the Leadership Fund is not allowed immediately to "solicit and accept unlimited contributions in order to conduct independent expenditures."  Pls.' Mem. at 33.  This claim, however, is highly dubious in light of the numerous alternative ways that the plaintiffs could engage in unlimited political speech. Most notably, the plaintiffs could form a Super PAC that paid its own administrative and solicitation costs and could therefore solicit unlimited contributions from the general public to finance unlimited independent expenditures.  The plaintiffs respond to this option by arguing that operating a Super PAC would be burdensome.  *See* Pls.' Reply at 11–12 (citing *MCFL*, 479 U.S. at 254–55).  The plaintiffs argue that the "additional requirements" of administering a Super PAC "'may create a disincentive for [plaintiffs] to engage in political speech.'"  *Id.* at 12 (alteration in original) (quoting *MCFL*, 479 U.S. at 254).  Yet, the plaintiffs do not say why the organizational, reporting, and record-keeping requirements of administering a Super PAC would be any more burdensome than the (identical) organizational, reporting, and record-keeping requirements of administering an SSF.  It appears that what the Leadership Fund would really like is to have its cake and eat it too—enjoy the benefits of an SSF (corporate subsidization of administration and solicitation expenses) while also enjoying the benefits of a Super PAC (unlimited fundraising abilities).  Choices have consequences, and requiring the plaintiffs to live with the limitations of the entity they chose to establish (an SSF) entails no more of an injury than requiring a "social welfare" organization to begin paying taxes if it chooses to operate its business for profit.  *See* 26 U.S.C. § 501(c)(4).

### C.   <u>**Balance of Equities and Public Interest**</u>

For many of the same reasons already discussed, the balance of equities tips in favor of the FEC rather than the plaintiffs.  Granting the plaintiffs the relief they request would force the FEC to ignore the congressionally mandated limits on the fundraising activities of SSFs without a sound constitutional basis for doing so.  Also, though the plaintiffs may not be capable of raising the amount of funds they would be capable of raising as a Super PAC, that wound is self-inflicted.  Furthermore, the plaintiffs do not seek a preservation of the status quo, but rather they seek fundamental change in how SSFs are regulated by the FEC, which would undoubtedly require new agency guidance and other burdens that are at least equal, if not far greater, than any burdens that would result from establishing a separate Super PAC to engage in the unlimited fundraising the plaintiffs desire.  Finally, and perhaps most importantly, "'[t]he presumption of constitutionality which attaches to every Act of Congress is . . . an equity to be considered in favor of [the government] in balancing hardships.'"  *Bowen v. Kendrick*, 483 U.S. 1304, 1304 (1987) (Rehnquist, C.J., in chambers) (quoting *Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323, 1324 (1984)).  That equity is in full effect here.

The public interest would also not be served by granting the injunctive relief requested by the plaintiffs.  As discussed above, the provisions challenged by the plaintiffs serve important governmental interests intended to protect the integrity of the electoral process.  Therefore, enjoining the enforcement of those provisions would palpably disserve the public interest, absent a strong countervailing First Amendment reason for doing so.

## IV.   **CONCLUSION**

In sum, the plaintiffs have failed to satisfy any of the four preliminary injunction factors in connection with their First Amendment claims, and thus they have failed to state a plausible

claim for relief.  Therefore, for the reasons discussed above, the plaintiffs' Motion for

Preliminary Injunction, ECF No. 4, is DENIED.  For the same reasons, the FEC's Motion to

Dismiss, ECF No. 8, is GRANTED.

An appropriate Order accompanies this Memorandum Opinion.


Date:  November 5, 2012


/s/ *Beryl A. Howell*
BERYL A. HOWELL
United States District Judge